21-10-271 K.Y. v. U.S. Attorney General See we have Mr. Ball here for the appellant and Ms. Marshall here for the petitioner. Good morning, your honors. May it please the court, Jonathan Ball of Blank Room representing the petitioner. It's an interesting case that even in this court has had some unusual twists and turns. The petitioner is a transgender woman and she filed this petition pro se together with an application to proceed in formal paupers. Her petition was denied by this court on the 17th and the order was accompanied by an opinion that said that the appeal was frivolous and characterized petitioner as a man arguing that he would be more likely than not subject to torture in Guyana due to his homosexuality. And that's not at all what the claim is as well developed in our briefs and as you'll hear in We became involved after that stage as pro bono counsel, sought reconsideration which was denied. The fee was paid and thus the appeals now proceeded. So we've gone from what was at first viewed as a frivolous appeal to one that the court has deemed worthy of oral argument. It seems to have taken a turn. With the court's indulgence this morning, of the three issues in our We intend to defer to our brief. We think it's adequately addressed. I'd like to focus my argument this morning on the issues arising with the claim for relief under the convention against torture and also the argument that the statute wasn't properly interpreted insofar as asylum and withholding of removal. Can I ask you just a couple of questions I guess before we just blow past the particularly serious crime issue? Yes sir. One, can you tell me what standard of review you think applies to that determination? It's mixed because elements of determining whether there was a particularly serious crime does involve some review of factual matters in the record. The question also is under what standard when there's other precedents out there that have said as a matter of law certain types of conduct. If you determine as a matter of fact that that conduct occurred, then you have to look at the law. The legal issues are fully reviewable de novo by this court. Right, but the fact finding would have to be reviewed under a very substantially deferential view, would it not? It's definitely more deferential so long as it's adequate support in the record. We've characterized it as not just more deferential, we've characterized it as highly deferential. It is highly deferential. We've gone so far as to say, and it's been hotly controverted, but we've gone so far as to say in this circuit that to reverse a factual finding by the BIA, this court must find not only that the evidence supports a contrary conclusion, but that it compels one. That's tall order. Completely different if we're looking at a legal issue or even the application of law. But the pure fact finding, it would be fair to say, is reviewed for a very, under a very high, highly deferential standard. That doesn't overstate it. No, that is correct. I think it's evident in our brief where we discuss under the issue about withholding of removal that we talk about circumstances where the evidence compels a contrary conclusion, which on that particular issue, we maintain that is in fact the case here. But as far as reviewing whether a particularly serious crime was committed, that's what the conviction was for. The factual element is highly deferential, yes. Okay, so my last question, at least with respect to this, and I'll just sort of put my cards on the table and let you react to it, but I mean, how is it that this is not a particularly serious crime when, among other things, it's a crime against persons, not property. It's a crime against a child. The punishment was pretty stiff, you know, 42 months plus 10 years. The facts, it seems to me, are pretty troubling. You know, your client was told multiple times that she was talking to a minor. Happened over the course of several weeks. When she showed up, she appeared ready to engage in the act. That all sounds pretty serious. I'm not here to condone my client's conduct, and the record is what it is, unfortunately. It was a lapse of judgment, but we had offered in our briefs comparators of other cases where there was conduct that we felt seemed to be on par, but yet was not determined to be a particularly serious crime. So it's a question of, there are the facts as determined by the immigration judge, and then how do they compare to other decisions holding whether or not similar conduct is a particularly serious crime. Granted, it's, you know, I think other of our arguments are certainly stronger and probably more worthy of the court's focus here, but I'll leave it at that. Help us, then, with the Catt claim. Okay. There's a legal issue in the Catt claim, or an error of law, in that the IJ, the board didn't write its own decision, so we're basically at the immigration judge's decision as the final agency determination. First of all, relief is mandatory on an application under Catt when the applicant meets the evidentiary burden, and whether the applicant has committed a particularly serious crime doesn't even factor in under Catt. Even criminals are entitled to Catt relief if they meet the threshold. Here the issue is whether the petitioner is a transgender woman being returned to Guyana is more likely than not going to be tortured or worse upon her return. As evidenced in this court's May 17th order, there seems to be some confusion here because when the petitioner previously lived in Guyana, at the time she presented as a male who was homosexual, but when she's being returned at this point, she's transitioned, she now presents as a transgender woman. The risks are different. The IJ found petitioner credible, and found her country conditions expert, Professor Willits, credible. And then, nonetheless, without offering explanation why she's rejecting 99% of their testimony, she concludes that the burden wasn't met here. The IJ's rationale is just unsupportable here. She points to two things in particular. One is the ambassador's remarks that conditions are getting better, or there's a softening of attitudes. But yet, the State Department's own country conditions report doesn't bear that out. It's atrocious conditions. And it may be wishful thinking on the ambassador's part. And it's nice to say that, but actions speak louder than words. What's the evidence of government involvement? It's more of government acquiescence in this case. The government's involvement is the records replete with examples of both homosexual and transgender individuals reporting incidents and basically being brushed off. It's just not a priority. Murders of transgender individuals go uninvestigated, unpunished. There are incidents of interactions between mostly police and homosexual and transgender individuals. Some of those don't in and of themselves rise to the level of torture, but when viewed in the context of what members of society do to homosexual and transgender individuals and the government's laissez-faire attitude about it, I think it certainly bears out that our client, the petitioner here, is indeed more likely than not to be subject to torture, with the key phrase being either by the government or at its acquiescence. And that standard we submit has been met here. But torture's got to be more than discrimination, doesn't it? It does. What are the specific acts of torture that would make it more likely than not that she'd be subjected to it? I mean, you point, there is, and conceitedly, there's plenty of evidence of discrimination and some evidence of acquiescence to that discrimination. I didn't see a lot of evidence of torture. She testified at the time she was living as a homosexual male in Guyana of being present when another person who was dressed, according to the attackers, too effeminately, was physically attacked. And I believe, I don't think it was stabbed with a knife, but struck with a broken bottle in a bar, and no one would come to this person's defense. Everyone watched it. Petitioner testified as if it was entertainment. So there's that, there's all the country condition reports. We've submitted hundreds, or the petitioner submitted hundreds of pages detailing murders, a transgender individual being burned to death, one being run over repeatedly by a car that they said, oh, just incredibly, now something else happened. They just dismiss it. And there are plenty of examples in the materials in the record that we cite in our brief of physical violence, not just discrimination, not just words, but actions, actions intended to or having the likely consequence of causing serious injury, which we submit meets the standard for torture. The other thing that the IJ claimed upon was having a gay pride parade. Well, that's one day out of the year, and they said there were no incidents at the parade. What about the other 364 days of the year? This record is just brimming with examples that are to the contrary of the IJ's findings, and it's evidence that she found credible. Professor Willett's testimony and all the documentary proof he relied on, and the petitioner's own testimony. We submit this as one of those rare cases where this evidence compels a finding that is to the contrary to the IJ's finding. Thank you. We're back. We're back. The microphones are back. Good. The issue whether a separate determination of danger to the community or society is needed. This is a troubling issue because in this court, in this circuit, the genesis of not requiring a separate determination finds its genesis in the 1985 concurring opinion by Judge Vance in the Zardoui-Quintana case, and the majority specifically said for other reasons in that case, we're not going to decide those issues. We don't have to, and in fact, we can't. But Judge Vance wrote a concurrence without much discussion and just says a separate determination is not needed. Zardoui-Quintana then gets cited as if it's a majority opinion conclusively determining that no second determination or separate determination is needed. It's contrary to the express, unambiguous language of the statute. It's in a positive phrase. The alien, having been convicted of a particularly serious crime, is a danger to the community. You don't, sorry, go ahead. Go ahead. Well, I was just going to say, but you don't deny, I assume, that the three of us are bound by Crespo-Gomez. The prior precedent rule, I'm familiar with it. We didn't, in hindsight, maybe we should have projected it here. What we think can happen, knowing what the precedent is in this circuit, is that any one of your honors could request a poll for en banc consideration by the court. And we think that this issue is worthy of en banc consideration. I don't know if your honors want to write a decision, then request a poll, or maybe based on what you've read in our briefs and hear an oral argument this morning, think it would be prudent to propose a poll before writing a decision. I'm familiar with your honors' decision, and I'm not sure if I have the pronunciation, Keohana, from last December. I know it's, there is some contention about when it's appropriate, but I think here, because if you just read the plain language of the statute, it's unambiguous. I don't think there's one decision ever in any circuit that uses the term a positive phrase when talking about that portion of the sentence, and that's what it is. You understand, I guess, that the remedy exists in a way with respect to this issue elsewhere. Probably before the en banc or a higher authority, but we're here now, and hopefully the court will consider that. Very well. Thank you for indulging me. Wait, Judge Middlebrooks, did you have a question? Justin, don't you also have the problem that that wasn't raised in the agency? We don't think that the waiver or exhaustion doctrine applies here because the board and the immigration judge, they're going to say, just as Judge Newsom pointed out, we're constrained. Even if we want to, we can't do anything to the contrary at this point, and it's an issue of law which this court's authority, even though in some circumstances, Chevron deference would be paid. Here, it can't be paid because it's not a reasonable interpretation because it's contrary to the express unambiguous language. So all the board could have possibly done, or the IJ in this case, is write an advisory opinion that you wouldn't be bound to follow. They couldn't grant relief. So we think this is one of those rare cases where because it's an issue of law, that you would review de novo anyway, it's not dependent on any fact finding, and that you wouldn't necessarily owe deference to any decision on the legal issue by the administrative agency here, that this falls within the narrow exceptions to waiver and administrative exhaustion. To Judge Middlebrooks' point, I'm actually not certain that the agency would have been bound to Crespo-Gomez just because under the Supreme Court's decision in Brand X, unless the judicial construction is one that sort of goes the extra mile and says we conclude that the statute is unambiguous, then the agency is free to render its own decision about what the statute means. Now, that doesn't really help you, I think, because even if you were to get through the agency and then you get to us, we're bound by Crespo-Gomez. But I'm not certain that the agency itself, that the hands of the agency itself would have been tied. I think it would just because of the volume of precedent where other arguments have been made on this issue, not the argument we're making, but other formulations of reasons why a separate determination of danger to the community is or should be required against all that weight. I don't see much, I don't see any realistic chance that the IJ or the board would do anything. It would be futile. Okay, very well. All right, good. So you've got three minutes remaining. Ms. Marshall, let's hear from you. Thank you, Your Honor. I'll let you bet. May it please the Court. I'm Lindsay Marshall on behalf of the Attorney General. At issue in this case are two holdings made by an immigration judge and reviewed and affirmed by the board. First, that petitioner's conviction for traveling to meet a minor, a conviction stemming from petitioner having solicited sex from a person that she believed was a child, was indeed a particularly serious crime. And second, that she did not show a likelihood of torture by or with the Guyanese government's acquiescence when she's never experienced violence there in the past and when the overall picture of country conditions shows that the Guyanese government is making attempts to enhance protection of the LGBT community. I'm not going to tell you how to make your own argument, but I'm guessing from your adversary's argument you might want to focus on the cat claim more than the particularly serious crime claim. That is part of the plan. I wanted to first, I want to devote the most of my time to the cat protection argument, but I wanted to first start out with a particularly serious crime argument about the standard of review question that you posed. We think that the standard of review is the abuse of discretion. We recognize this court has some conflicting precedent here, whether it should be the abuse of discretion or a discretionary determination that is insulated from judicial review by 1252A2B2, but we think that the Supreme Court's decision in Kukana clears that up on the side of abuse of discretion. In that case, the Supreme Court explained that when you try and determine if it falls under B2, you look to the statute to see if it specifies that the determination is in the discretion of the Attorney General, and that requires an additional step. Not every discretionary determination will fall under B2. Only the ones where Congress takes the additional step to specify it in the statute. We don't have that here. We just have a statute that says that the AG can determine whether it is a particularly serious crime. So that's clearly a discretionary determination, but not a type of discretionary determination that falls outside the court's jurisdiction. So even if we're within, we're not outside the court's jurisdiction because it hasn't been specified as discretionary. You're saying it's nonetheless discretionary, and therefore, the standard is abuse of discretion. Yeah, because the statute says it's a determination from the AG. We think that points to discretion, and this court's precedent really only applies either the B2 jurisdictional stripping language or abuse of discretion. We think the abuse of discretion line of cases is the correct one to follow in light of Kukana. I'll turn to cap protection. The issue here is whether compelling evidence supports the agency's determination. This court has explained that under the standard of review, even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision. And here, given the backdrop of the record, which shows that she never experienced violence in the past, even though people recognize that she was a member of the LGBT community, and the steps that Guyana has taken to increase the protection and bring the LGBT community into the full protections of society, we just can't say that the agency's decision is unreasonable. The agency held that it was not more likely than not that she would be tortured by the Guyanese government, and this is borne out by the record. I think it's striking that even though her expert witness testified that she would be surprised if Petitioner didn't experience violence, she already lived in Guyana until 2010 and didn't experience violence. Was she living as a transgender woman at that point? She was not, but she was recognized as a member of the LGBT community and even so never experienced violence, even though she was approached by people who did accuse her of being part of that community. But is it possible that the evidence with respect to discrimination or, as Judge Middlebrooks points out, something a lot worse than discrimination visited upon gay and lesbian individuals might be different, less extreme than transgender individuals? I think that could be true. The question here, though, is more than just is it possible. It's a likelihood, a more likely than not, and not just more likely than not could she experience treatment that amounts to torture. It also has to take place by or with the government's acquiescence. There's really not a lot of evidence here that supports the contention that the Guyanese government itself would try and torture her. There is some evidence about harassment, discrimination, even extortion, but those things don't rise to the level of torture. So the question is would they acquiesce? And the agency points out that even though there is troubling evidence of the police being unwilling to fulsomely investigate certain crimes against the LGBT community, there is also a lot of evidence showing that the government is taking steps to make things better, evidence that was visible enough that the U.S. ambassador remarked on it that it signaled a softer tone. This evidence includes things like putting police officers through training on the community such that they're more open to coming forward to report crimes, shifting focus to use a gender-neutral sex crime law to remove the fear of prosecution from people who come forward to report the crimes. They permitted a pride parade with no instances of violence. The expert witness testified that police don't act with impunity, and there are measures to report abuses. And the record also includes instances of police action like warning harassers to stop it and also that these occurrences happen most especially when the person is known to the police. This court has explained repeatedly that when a government takes steps to improve conditions, even if the results are not perfect or still in progress, those efforts cut against a finding of acquiescence, that the government is more likely than not to acquiesce to torture. And that's what we have here. Given this record evidence, we just can't say that the agency's determination is based on an unreasonable basis. If there are no questions on that topic, I want to briefly turn back to the particularly serious crime analysis. Much of Petitioner's argument revolves around a statutory interpretation question. But as they concede in their opening brief, they have an exhaustion problem because they never raised this before the agency. And that's a jurisdictional prerequisite. Judge Newsom, you were right to question the ability of the board to reach this question because even in light of circuit court precedent that doesn't fall in line with the board, they have in the past expressed a different interpretation and asserted it. Matter of NAM is a good example of this. That's the case where the board set out its precedential framework for analyzing a particularly serious crime. And in it, it explicitly called out the Third Circuit and disagreed with its approach of limiting particularly serious crimes to aggravated felonies. This court has explained in previous cases that the exhaustion requirement is necessary because the agency has the authority to interpret and even reverse its own precedential interpretation of a statute. And so Petitioner was required to give them the first pass here and just didn't. Because of that, she's tied our hands here now. We just can't reach the question. To the extent that she... Does the government have a position about the proper interpretation of the statute if it weren't foreclosed to us? Well, we agree with every other circuit and the board that have ruled on this issue that the dangerousness analysis is not required. This court explained it as a cause and effect relationship that when someone is convicted of a particularly serious crime, that's the cause, they are dangerous to society. That's the effect. And to the extent that Petitioner points out that decision, Crespo-Gomez, as only relying on a concurring opinion, this is really a situation of yesterday's dissent becoming today's majority. Judge Vance was on the panel in both cases. And while his reasoning was just a concurrence in the initial case, in Crespo-Gomez, the panel adopted that reasoning as the majority opinion. And since then, I think that was in 1986, 40 years of precedent have construed that as a proper holding, that this dangerousness analysis is just not required. Even as recently as 2018 in the Sopo case. We think that on both points, the record amply supports what the agency did here. On the particularly serious crime analysis, they faithfully applied the correct legal analysis. They considered the facts and her excuses and still determined that what she did was a particularly serious crime. And then when adjudicating her CAT application, the agency carefully weighed the record and determined that notwithstanding the evidence that she presented, she still had not shown a likelihood that it was more likely than not that she would be tortured by or with the government's acquiescence if she was removed to Guyana. And for those reasons, the court should deny the petition for review. Okay. Very well. Thank you so much, Mr. Ball. You've got three minutes of rebuttal time remaining. Thank you, Your Honors. I apologize in advance for randomly jumping around to address some of the points in the government's argument. First, the notion that the statute reads as cause and effect, that's just not the case. The reason why is that don't forget what the statute is doing there. It's telling you who is not eligible for a certain form of relief. And in telling you who's not eligible, if the end all was if you've ever been convicted of a particularly serious crime, you're disqualified. The statute would say that. It would say any alien who has been convicted of a particularly serious crime, period, hard stop. That would be it. That's not how the statute reads. The appositive phrase is not cause and effect. It modifies the subject of the sentence, which is the alien in one formation, immigrant in another. Let's just say the applicant. It's not every applicant who's seeking CAT relief. It's a limiter. It's of all those applicants, the ones that at some point were convicted of a particularly serious crime, now you have to determine whether they're a danger to the community or society. There's a reason for that. Some of the precepts of our criminal justice system in terms of incarceration are that it will be a deterrent and that there's the opportunity for rehabilitation. By making you make that separate determination of dangerousness, has this person been rehabilitated? Have they been deterred? You're throwing that out the window. It just doesn't matter. And you don't put words in a statute just to have them there. It would be mere surplusage, and we don't do that. The words are there for a reason, and the reason is if someone's been convicted of a particularly serious crime, you then have to go and look further to see are they still at this time a danger to the community or society. Regarding the ambassador's signal, if it was a signal, it was a dog whistle. It's an empty gesture. The State Department, and she's part of the State Department, its own report is contrary to what she said there. And by way of example, Your Honor, Judge Newsom, you wrote in a decision, Cazares-Zandre, in examining when a government has acquiesced or is acquiescing in a torture, you looked at certain factors. What laws have they enacted to protect the LGBT community? Do they prosecute killers of LGBT individuals? Have they trained the police? And what have they trained them in with respect to that community? Have they allocated more police resources to crimes directed towards members of the LGBT community? I submit to you that on this record, there is scant to no evidence whatsoever of any meaningful steps. And there is evidence in the record. If you look at page 11 of our opening brief, we cite to the petitioner's testimony, and this is when she was then presenting as a homosexual male living in Guyana, that she had, in fact, been threatened with and actually beaten once. And what happens if you don't accede? If a police officer tries to extort you, you pay it, there's no violence. What if you don't have money? What if you just are tired of it and you don't accede to that demand? What happens next? They threaten you. She testified she had been threatened with beatings if she doesn't comply with whatever they're telling her to do. Do you have to wait until someone gets maimed or killed before you're willing to find the likelihood or more likely than not that it will happen? I think if you take a police officer at their word and they say, I will beat you, we submit that's enough. You don't have to wait for them to become a dead body on the ground before it's enough. That's not the standard. All right, very well. I see you're about a minute and a half over. I apologize. Thank you for your— I wanted to give you your time to finish the point. And most importantly, I want to thank you for taking the case pro bono. It's a service to us and a service to the cause of justice. Thank you very much. Thank you, Your Honors. All right, that case is submitted.